Case 2:13-cv-00007-HB   Document 8   Filed 01/22/13   Page 1 of 15
01/22/2013 TUE 12:54  FAX 2158308365 HEALOGIX                                      ☑002
Case 2:13-cv-00007-HB   Document 8   Filed 01/22/13   Page 1 of 20

*To the Clerk:*
*Kindly docket.*
*James Bartle*
1/22/23 *Rec'd J.*

**FILED**

JAN 2 2 2013

MICHAEL E. KUNZ, Clerk
By _____ Dep. Clerk

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LEO GIBNEY | : | CIVIL ACTION |
| Plaintiff | : | |
| | : | |
| v. | : | NO. 13-7 |
| | : | |
| THOMAS FITZGIBBON AND | | |
| MERCK & CO., INC. | : | |
| Defendants | : | |

### ORDER

AND NOW, this _____ day of _____, 2013, upon consideration of Defendants' Motion To Dismiss For Failure To State A Claim Upon Which Relief Can Be Granted And/Or Lack Of Personal Jurisdiction Pursuant To Federal Rules Of Civil Procedure 12(B)(6) And 12(B)(2) and Plaintiff's opposition thereto, IT IS ORDERED that the motion is DENIED.

IT IS SO ORDERED

DATED _____ U.S.D.C.J. _____

1

01/22/2013 TUE 12:54 FAX 2158308365 HEALOGIX
Case 2:13-cv-00007-HB   Document 8   Filed 01/22/13   Page 2 of 15
Case 2:13-cv-00007-HB   Document 8   Filed 01/22/13   Page 2 of 20
@003

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **LEO GIBNEY** | : | **CIVIL ACTION** |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | **NO. 13-7** |
| | : | |
| **THOMAS FITZGIBBON AND** | | |
| **MERCK & CO., INC.** | : | |
| **Defendants** | : | |

**FILED**

**JAN 2 2 2013**

MICHAEL E. KUNZ, Clerk
By_____Dep. Clerk

### PLAINTIFF LEO GIBNEY'S

### ANSWER & OBJECTION TO

**DEFENDANTS' MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED AND/OR LACK OF PERSONAL JURISDICTION PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE 12(B)(6) AND 12(B)(2)**

### I.     INTRODUCTION

Plaintiff here objects to Defendants' Motion To Dismiss For Failure To State A Claim Upon Which Relief Can Be Granted And/Or Lack Of Personal Jurisdiction Pursuant To Federal Rules Of Civil Procedure 12(B)(6) And 12(B)(2) and Memorandum to support the motion.

As the Court is aware, Defendants are *required to assume that the allegations in the Complaint are true* and that, even so, Plaintiff has no claim upon which relief can be granted.

1

01/22/2013 TUE 13:54  FAX 2158908365  HEALOGIX                              Ø004
Case 2:13-cv-00007-HB   Document 8   Filed 01/22/13   Page 3 of 15
Case 2:13-cv-00007-HB   Document 8   Filed 01/22/13   Page 3 of 20

Hopefully, in going through their 16 page Memorandum to support the Motion to Dismiss, the Court notes how Defendants have strayed so far off course not only in how they spin the evidence that will be presented in this case, which is entirely inappropriate for such a motion, but in how they attempt to deceive the Court by blurring the lines between Plaintiff's separate and prior action against his previous employer (Evolution) and the present action against Defendants.

Of most importance, Plaintiff hopes the Court will agree that Defendants have completely distorted the alleged defamatory statements in the May 15, 2012 letter by falsely asserting that the statements were in response to Plaintiff's allegations of fraud and "overbilling" about his prior employer in his correspondence with Merck. Plaintiff never used the words "fraud" or "overbilling," nor made any such allegations, in his *correspondence with Merck*, to which FitzGibbon was responding in his May 15 letter. Defendants' assertions that Plaintiff did—complete with quotation marks ("overbilling") -- are false and deceitful.

By vacillating, and blurring the lines, between Plaintiff's prior and separate action against his former employer (Evolution) and the present action, Plaintiff hopes the Court finds the intended deception on the part of Defendants to be a serious matter. As discussed in detail below, Plaintiff never made allegations of "fraud" or "overbilling" to Merck and that is not what FitzGibbon was responding to. Plaintiff made specific, detailed allegations about his previous employer's billing practices to Merck and referenced documents and a Merck employee that would substantiate Plaintiff's billing allegations. FitzGibbon, in his May 15 letter, falsely declared that Plaintiff "alleged overbilling" and falsely declared that Plaintiff's *actual* allegations were "unfounded" while, incredibly and simultaneously, stating his refusal to audit the documents that would substantiate Plaintiff's actual claims of violations in the face of the plain language of the contract.

This Court has personal jurisdiction over Thomas FitzGibbon and there is no due process violation.

**II.   ARGUMENT**

       **a.  The Complaint Clearly States A Claim Upon Which Relief Can Be Granted By Identifying A Defamatory Statement. Identifying Special Harm Resulting From The Publication Is Not Required, As It Is Libel.**

          i.  <u>Defamatory statement is in bold, italics, and underlined (Complaint at ¶ 13):</u>

2

01/22/2013 TUE 3:58 FAX 2148903365 HEA OGILY
Case 2:13-cv-00007-HB   Document 8   Filed 01/22/13   Page 4 of 15
Case 2:13-cv-00007-HB   Document 8   Filed 01/22/13   Page 4 of 20
☑005

While the entire letter in which the defamatory statement was made was not attached to the Complaint, the "material part thereof" was included, in accordance with Pa. R. Civ. P. 1019(i). Furthermore, since Defendants wrote the letter, they have it.[1]

ii.   Libel is defamation *per se* in Pennsylvania

The Superior Court of Pennsylvania has explained the difference between libel and slander as follows: Libel may be defined conveniently as "A method of defamation expressed by print, writing, pictures, or signs." Black's Law Dictionary 824 (5th ed. 1979). Slander, broadly, is usually understood to mean oral defamation. *Id.* at 1244. The written statements at issue in this case constitute libel, not slander. Pennsylvania law clearly provides that *all* libels are defamatory *per se*. A necessary corollary is that under Pennsylvania law, libel plaintiffs are *never* required to prove special damages. Agriss v. Roadway Express, Inc., 334 Pa. Super. 295, 319-20, 483 A.2d 456, 469 (1984). As clearly stated by the Agriss Court, "Pennsylvania definitely follows the general rule that *any libel is actionable without proof of special damages.*" 334 Pa. Super. at 324, 483 A.2d at 472 (emphasis added).

iii.   The defamatory statement identified is also defamation *per se*, as it is "injurious to another in their trade, business or profession."

In the present case, FitzGibbon sent this May 15, 2012 letter not only to Evolution, in Pennsylvania, but other Merck employees, including Brian Cain, Merck's VP overseeing marketing research, which is Gibney's profession. Gibney has conducted marketing research projects for Merck for more than a decade and was once a preferred vendor for Merck. There can be no question that Plaintiff's professional reputation within Merck has been permanently damaged by FitzGibbon's false declaration that Plaintiff made "unfounded" accusations about his former employer, Evolution, as stated in the Complaint (¶ 13). Furthermore, Plaintiff never "alleged overbilling" in his correspondence with Merck.

[1] The Complaint was verified. In their January 2, 2013 *Praecipe To File Notification Of And Copy Of Notice Of Removal*, Defendants themselves included the verification page with Plaintiff's signature. The last page of the Complaint itself was also signed by Plaintiff and all of this was sufficient for the Complaint to be accepted by the Prothonotary in Montgomery County, Pa.

3

**b. The Pennsylvania Long-Arm Statute Permits Jurisdiction Over Both Defendants. There Is No Due Process Violation, Consequently.**

It is to be exercised "to the fullest extent allowed under the Constitution of the United States and may be based on the most *minimum* contact with the Commonwealth allowed under the Constitution of the United States." 42 Pa.C.S.A. § 5322(b); *see also* <u>Grand Entertainment Group v. Star Media Sales</u>, <u>988 F.2d 476</u>, 481 (3d Cir.1993) (describing Pennsylvania long-arm statute).

In this very District Court, where Judge Katz dismissed a case because the plaintiff could not establish that the defendant had any contact with this forum, the judge noted that letters and phone calls would suffice. "Banner cannot point to any contacts Maldonado has had with this forum, much less any that are specific to the case at hand. There were <u>*no letters or phone calls*</u> into Pennsylvania, and Maldonado never entered Pennsylvania for any purpose." (Emphases added) See <u>Banner Promotions, Inc. v. Maldonado</u> 56 F.Supp.2d 555 (E.D. Pa.1999).

In the present case, FitzGibbon sent his letter with the defamatory statements to Plaintiff's former employer, Evolution, in Pennsylvania, enabling Evolution to countersue Plaintiff for defamation (*Leo Gibney v. Evolution Marketing research, LLC*, Case 2012-10933). Also, in his May 15, 2012 letter, Defendant FitzGibbon makes clear he had multiple telephone discussions with Evolution. (See Exhibit A). Furthermore, FitzGibbon interacts regularly with Merck employees at its Montgomery County, PA location. Finally, in the above mentioned action between Gibney and Evolution, a subpoena addressed to FitzGibbon at Merck's *West Point, PA* facility was received by FitzGibbon, as the certified letter containing the subpoena was signed by an authorized agent in PA, further clarifying that FitzGibbon has more than *minimum* contacts with this forum.

**c. Defendants Grossly Misrepresent The Defamatory Statement In FitzGibbon's May 15 Letter (Compl. At ¶ 13). The Defamatory Statement Is FitzGibbon's Declaration That Plaintiff's Claims About Evolution's Are "*Unfounded*" And That Plaintiff "*Alleged Overbilling*." Plaintiff Never Alleged "Fraud" Or "Overbilling" In His Correspondence With Merck. There Is Clear <u>Evidence</u> That Plaintiff's <u>Actual</u> Claims Are Not Unfounded.**

Either through abject sloppiness or with an intent to deceive this Court, Defendants state in <u>paragraph 2, page 7</u> of the Memorandum that "Defendants' assessment of Plaintiff's claim that his prior

4

employer, Evolution, *engaged in fraud and 'overbilled' Merck* does not constitute defamation." (emphasis added). First, Plaintiff, in his correspondence with Merck (See Exhibit B), to which FitzGibbon was responding in his May 15 letter, *never alleged nor used the words "fraud" or "overbilling."* Plaintiff referred to billing "violations" in the face of "the clear language of the contract," but *never* alleged "overbilling[2]," "fraud," or other criminal activity in his correspondence with Merck. Plaintiff alleged refusal to engage directly in fraudulent billing in his separate wrongful termination suit against his former employer, Evolution, but never in correspondence with Merck[3]. It is clear Defendants are trying to blur the lines between that action and the present action and it is deceitful.

For example, in paragraph 10 of the Complaint, Plaintiff refers to the letter he sent to Kuhlik and Bowles of Merck "detailing the alleged fraud." However, the "fraud" reference is to the previous paragraphs in the Complaint where Plaintiff notes what his action against his prior employer, Evolution, is about. The "details" (Complaint at ¶10) in the actual letter to these individuals (Exhibit A), reference multiple "violations" in the face of the "clear language of the contract." Plaintiff never alleges "fraud" or "overbilling" in his correspondence with Merck to which FitzGibbon was responding in his May 15 letter.

What is defamatory is FitzGibbon's declaration, in writing to the multiple parties *stated in the* Complaint, that Plaintiff's claims about Evolution's billing practices, which are in violation of the clear language of the contract, are *"unfounded,"* when evidence will reveal the claims are not "unfounded." If evidence shows that Plaintiff's claims in his correspondence to Merck are not "unfounded" –*regardless of whether Merck concludes it was overbilled or not*–then FitzGibbon's written declaration that Plaintiff made "unfounded" claims is libel, as clearly stated in the Complaint. Furthermore, FitzGibbon's declaration that Plaintiff "alleged overbilling" is also libel, as Plaintiff never alleged this to Merck.

With regard to evidence that would support Plaintiff's claims about Evolution's billing practices, the Court may find it truly incredible that FitzGibbon clearly states his refusal to audit the documents that would support Plaintiff's billing claims and, in the same sentence, declares that Plaintiff's statements are "unfounded." (Compl. at ¶ 13). Furthermore, it was a telephone conversation during October 2011 Plaintiff had with a Merck employee, Karen Ambrose, that alerted Plaintiff to his former employer's

---

[2] Defendants carelessly and recklessly assert that Plaintiff used the word "overbilling" (p.3 and 7 of Memorandum) in both his Complaint against his prior employer and, more importantly, in his correspondence with Merck. Plaintiff never used that word in any communication. And this is not a minor word parsing issue, as it completely nullifies any contention that the alleged defamatory statements are nothing more than Merck's conclusion about whether or not it was overbilled by Plaintiff's former employer.

[3] The Court will also note that Plaintiff's correspondence with Merck, to which FitzGibbon was responding on May 15, occurred *prior* to Plaintiff's wrongful termination suit against Evolution in Montgomery County (filed May 1, 2012), further underscoring the deception.

5

billing practices in violation of the contract with Merck. This discussion with Ambrose is part of the "detailing" in Plaintiff's letter to Kuhlik and Bowles (Exhibit B) referenced in paragraph 10 of the Complaint. Thus, at least one Merck employee, as well as the documents FitzGibbon refused to audit, will provide the evidence that Plaintiff's billing claims were not "unfounded." This is the heart of the matter, not whether FitzGibbon's *conclusion* that Merck was not overbilled is defamatory (although FitzGibbon's declaration that Plaintiff "alleged overbilling" is also libel, since Plaintiff never told Merck it was "overbilled" by Evolution).

Plaintiff would also remind the Court that, as stated in the Complaint, Plaintiff's name was on the Merck contract at issue and Plaintiff had a "binding, legal authority" to uphold that contract, as *mandated* by Merck (Complaint at ¶9). (Plaintiff attaches the contract as Exhibit C, mindful that since Defendants are required at accept the allegations in the Complaint as true, it is not required at this point.

Again, in the present case, Plaintiff never used the word "fraud" or "overbilled" in any communication with Merck to which FitzGibbon was responding in his May 15 letter. Defendants' couching the defamation claims in this language is deceitful, especially when quotation marks are used to indicate that Plaintiff used words he never used.

### d. Thomas Fitzgibbon Is Not Immune To Plaintiff's Claim.

Defendants' reference to Smith v. Griffiths (476 A.2d 22, 26, Pa. Super. Ct. 1984) is irrelevant, as Merck is FitzGibbon's employer, not client. Furthermore, Plaintiff does not believe FitzGibbon's acts were "...in good faith, for the purpose of protecting the interests of [his] clients." *Id.* FitzGibbon's defamatory statements were not made in the context of any legal action involving Merck. Thus, Defendants' reference to Richmond v. McHale (35 A.2d 779, 785, Pa. Super. Ct. 2012) is also not relevant, as there is no litigation context whatsoever with respect to these correspondences.

For all of the above reason, Plaintiff respectfully requests that Defendants motion be DENIED.

Respectfully submitted,

Leo Gibney, Pro Se                January 19, 2013

6

01/22/2013 TUE 12:37 FAX 2158308365 HEALOGIX
Case 2:13-cv-00007-HB    Document 8    Filed 01/22/13    Page 8 of 15
Case 2:13-cv-00007-HB    Document 8    Filed 01/22/13    Page 8 of 20
@009

# EXHIBIT A

Merck & Co., Inc.
One Merck Drive
P.O. Box 100
Whitehouse Station NJ 08889-0100

May 15, 2012                     **MERCK**

**VIA E-MAIL AND U.S. MAIL**
Leo Gibney, Ph.D.
348 Beechwood Lane
Berwyn, PA 19312

Dear Dr. Gibney:

I am responding to your letter dated April 26, 2012 to Richard S. Bowles III, Ph.D. and Bruce N. Kuhlik, Esq. I also note you have previously written to Merck regarding these same allegations on December 1, 2011 and your lawyer, Dolores M. Troiani, Esq., sent us a related letter dated March 14, 2012 to which I responded on April 27, 2012.

We appreciate you bringing your concerns about billing improprieties to Merck's attention. We generally regard our relationships with our suppliers as confidential and do not share the results of our reviews of supplier billing with third parties, *however*, in this case, given your multiple communications, and with Evolution's permission, we will make an exception. We have reviewed the alleged overbilling by Evolution you claim occurred and we are satisfied that Evolution did not overbill Merck. While I note your "request" for an audit, we see no need for any such audit. As far as Merck is concerned, the alleged overbilling has been investigated, the allegations have been determined to be unfounded and the matter is now closed and warrants no further attention or action by Merck.

Further, to be clear, the project you state in your most recent letter was awarded to you toward the end of 2011 was, in fact, awarded to Evolution. Consequently, if and to the extent any billing or other disputes arise relating to that matter in the future they would be a private matter solely between Merck and Evolution and not matters we would discuss with or disclose to you. I made an exception to that confidentiality in the prior paragraph only after conferring with Evolution and in the hopes of finally putting this matter to rest.

As for the termination of your employment by Evolution, you have our sympathy but that is a matter to be resolved exclusively by you and Evolution. We understand you believe your termination by Evolution resulted from you alerting Evolution to the billing irregularities referred to above. We certainly understand that any termination is difficult and we hope you are able to overcome such event, but we are simply not in a position to assist you in resolving your employment situation with respect to Evolution.

At the time of the incident, you were not a Merck employee nor were you even under contract as a supplier to Merck. Instead, we understand from your and your lawyer's letters that you were

an employee of Evolution. Consequently, any employment decisions, including termination, made by Evolution which affected you were and remain beyond Merck's control. Merck expects, and communicates such expectation to its suppliers, that all Merck suppliers will act ethically and fairly; *however*, Merck is not in a position to interfere with the internal employment decisions of its suppliers. If Evolution's actions with respect to your termination are found to be illegal, Merck will certainly take such determination under advisement in assessing the status and scope of Merck's future relationship with Evolution.

Your letter to Messrs. Kuhlik and Bowles also repeats claims raised in your lawyer's letter that you were once a preferred vendor to Merck but now "obstacles have been put in place" which you believe have resulted in Merck not retaining you for new projects. As I explained in my letter to your lawyer, by ending your direct relationship with Merck and becoming an employee of Evolution you ceased to be a supplier to Merck. Merck has publicly announced a variety of cost-cutting efforts in the last few years resulting in, among other things, a reduction in the number of suppliers we work with in various categories. Even in the best of times there is never any assurance that a former supplier who ends his direct relationship with Merck would simply resume his supplier relationship with Merck if he wanted to do so at a later date. Given Merck's current cost containment initiatives and efforts to focus our business on fewer suppliers, the resumption of such relationship is not only not assured, it is unlikely.

On behalf of Merck, I wish you well in your future endeavors.

Very truly yours,

Thomas M. FitzGibbon
Legal Director


cc:    Dolores M. Troiani, Esq. (via e-mail and U.S. Mail)
       Bruce N. Kuhlik, Esq. (via e-mail)
       Richard S. Bowles III, Ph.D. (via e-mail)
       Mr. Levi Barnes (via e-mail)
       Mr. Brian Cain (via e-mail)

# EXHIBIT B

Leo Gibney, Ph.D.
348 Beechwood Lane
Berwyn, PA 19312
Leo.Gibney@gmail.com
Tel: 610-563-0762


April 26, 2012

Richard S. Bowles III, Ph.D.
Executive Vice President and Chief Ethics & Compliance Officer

Bruce N. Kuhlik, Esquire
Executive Vice President and General Counsel

Merck & Co., Inc.
1 Merck Drive
Whitehouse Station, NJ 08889-3400

Dear Dr. Bowles and Mr. Kuhlik:

Toward the end of 2011, while working for Evolution Marketing Research, I was awarded a marketing research project by Merck worth over $1,000,000. The project is known as "Cogent market research portion."

Evolution is a Merck preferred marketing research vendor and Merck awards Evolution millions of dollars annually to conduct marketing research projects.

I was terminated by Evolution on November 7, 2011, after I discovered that Evolution was routinely and improperly billing Merck for professional services related to quantitative marketing research projects. Evolution was effectively double-billing Merck for services that should have been included as part of Evolution's pre-negotiated professional fees.

Just 1.5 business days prior to my termination, on November 3, 2011, I sent a meeting invitation to discuss these billing violations. The invitation was to Evolution's principals and general counsel. I have attached a copy of the meeting invitation. All of the bolded services are services that Evolution has subcontracted out to other vendors and charged Merck, in violation of the contract. These services are often covered under the broad umbrella of "programming" and/or "data processing" by Evolution's vendors.

The principals declined to meet, but the general counsel, Dan Slawe, met with me. He oversees all of Evolution's contracts. He was not happy about the meeting. After I explained my concern, he stated "If you are right, then I guess we won't do business with Merck any longer." He said he would look into the matter and get back to me.

01/22/2013 TUE 9:52 FAX 2158900365 HEALOGIX
Case 2:13-cv-00007-HB   Document 8   Filed 01/22/13   Page 13 of 15
Case 2:13-cv-00007-HB   Document 8   Filed 01/22/13   Page 13 of 20
Ø014

Richard S. Bowles III, Ph.D.
Bruce N. Kuhlik, Esquire
April 26, 2012
Page 2

He got back to me on November 7, ostensibly to discuss the Merck contract. Instead, I was simply and coldly terminated. No severance and no explanation other than "You obviously don't like the way we do things around here. You would be a better fit somewhere else."

I also have a hard copy of a document that shows that Evolution was planning on shifting over $40,000 of legitimate out-of-pocket costs over to illegitimate out-of-pocket costs in the above mentioned "Cogent" project, *after* I had already properly accounted for the costs for this project on Merck's Research Hub and approved the invoices.

I filed a wrongful termination complaint with the U.S. Dept. of Labor (DOL). Because Merck is a publicly-traded company and Evolution is a contractor to Merck, the U.S. Dept. of Labor agreed that my allegations of wrongful termination warranted an investigation, based on section 806 of the Sarbanes-Oxley law. This investigation is still in progress.[1]

In my complaint to the DOL, I named Karen Ambrose (Merck procurement) and Brian Cain (VP) as two Merck employees that I notified about the improper billing practices of Evolution. It was a telephone conversation I had with Karen Ambrose that alerted me to the possibility that Evolution may have been violating the MVA contract.[2] As part of their investigation, the DOL may contact these individuals.

I also notified Bill Mitchell, a marketing research analyst working on the "Cogent" project, about the situation immediately upon my termination. He notified his supervisor, Carolyn Gretta. In a subsequent phone conversation, Mitchell told me that Gretta decided to side with Evolution.

Carolyn Gretta and Brian Cain have a long history working with Evolution dating back to Schering-Plough. They have never worked with me. However, I was a preferred vendor for Merck for many years prior to joining Evolution and Merck has always been my most valued client.

---

[1] Leo Gibney v. Evolution Marketing Research, LLC, No. 3-0050-12-011
[2] I told Karen we were offering a steep discount on the Cogent project and that we were also going to do all of the programming and everything that goes with the programming (data processing, editing, cleaning, tables and files, statistical analysis, etc.) as part of our professional fees. This would be the first time we did this for a Merck project using our own programmer.

Karen told me that those services should already be included in our professional fees. I had never seen the actual MVA contract. After looking into it further, I discovered Karen was correct. The company always subcontracted that work to other vendors and billed Merck as an "other" out-of-pocket cost, instead of paying for these services out of Evolution's professional fees, despite the clear wording of the contract.

01/22/2013 TUE 2:12 FAX 202 863 5450 REAL LOGIC ☑015

Case 2:13-cv-00007-HB   Document 8   Filed 01/22/13   Page 14 of 15
Case 2:13-cv-00007-HB   Document 8   Filed 01/22/13   Page 14 of 20

Richard S. Bowles III, Ph.D.
Bruce N. Kuhlik, Esquire
April 26, 2012
Page 3

It also appears that my reputation at Merck has been damaged. Despite several attempts by other Merck employees to have me considered for marketing research projects, since being terminated by Evolution, obstacles appear to have been put in place.

You should know that another major pharmaceutical company, GSK, audited Evolution in the 2008-2009 time period and found billing violations. Evolution's business with GSK ceased.

I was fired for trying to do the right thing on Merck's behalf. As members of Merck's executive committee, I am certain that you will want to have this matter investigated internally, given the millions of dollars Merck pays Evolution annually to conduct marketing research projects.

I was a preferred vendor with Merck for almost 10 years before joining Evolution in 2009. There are many Merck employees who will attest to the quality and integrity of my work for Merck over those many years.

If an audit has not been conducted, I am asking that one be done for all of Merck's projects with Evolution over the past two years.

Please do not hesitate to contact me with any questions.

Sincerely,

Leo Gibney, Ph.D.